IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AARON E. FULGHAM,

    Petitioner,                        No. CIV S-03-1714 MCE KJM P

   vs.

CHERYL PLILER[1], Warden,

    Respondent.                     FINDINGS AND RECOMMENDATIONS

                                   /

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner raises a single claim: that petitioner's Sixth Amendment rights were violated when the trial judge removed a juror during jury deliberations. Pet. at 5. Respondent has filed an answer, and petitioner has filed a traverse.

I.  Factual And Procedural Background

        The following statement of essential facts is taken from the unpublished opinion

/////

/////

---

[1] The current warden of California State Prison, Sacramento, where petitioner is housed, is Cheryl Pliler. As provided by Federal Rule of Civil Procedure 25(d)(1), Cheryl Pliler is therefore substituted for Roseanne Campbell as the respondent in this action.

1

1 of the California Court of Appeal, and is supported by the record:

> Jeff Stetka resided in room 37 of the Rolling Green Motel. Roslynn Foote resided in room 34. Foote's guests, defendant and codefendant Rudy Murphy, planned and plotted to rob Stetka. During the robbery, defendant stabbed Stetka four times, causing his death. Defendant and Murphy took sports jerseys, a coat, binoculars, knives and a VCR from Stetka's motel room.

Answer, Ex. I at 2.

On April 28, 1998, after a jury trial in which petitioner was tried with his codefendant, petitioner was found guilty of murder and robbery. The jury also found that petitioner personally used a deadly weapon and found true the special circumstance that the murder occurred during the commission of a robbery. The jury did not find true the special circumstance that the murder occurred during the commission of a burglary. CT 462-464.[2] On August 19, 1998, the trial court sentenced petitioner to a term of life without the possibility of parole for murder and a consecutive one year term for the weapon enhancement. Sentence on the robbery conviction was stayed based on California Penal Code § 654. CT 545.

Petitioner's direct appeal was denied by the California Court of Appeal. Answer, Ex. D (Court of Appeal opinion). The California Supreme Court granted petitioner's petition for review and remanded the case back to the Court of Appeal to reconsider the case in light of People v. Cleveland, 25 Cal.4th 466 (2001). Answer, Exs. G & H (Supreme Court decisions). On remand, the California Court of Appeal reaffirmed its previous decision and denied petitioner's appeal. Answer, Ex. I (Court of Appeal opinion). The California Supreme Court denied petitioner's second petition for review. Answer, Ex. K (Supreme Court denial).

Petitioner filed this petition for federal habeas relief on August 14, 2003.

/////

/////

---

[2] CT stands for the Clerk's Transcript, which has been lodged with this court. RT stands for the Reporter's Transcript, which also has been lodged with the court.

II. AEDPA Standards

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA). See Ramirez v. Castro, 365 F.3d 755, 773-775 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[3] Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir 2003) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)). It is the habeas petitioner's burden to show that he is not precluded

---

[3] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief. See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

3

from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an "independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular

application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III. Removal and Substitution of a Juror During Jury Deliberations

Petitioner argues that the trial judge violated his Sixth Amendment right to trial by jury when the trial judge dismissed the lone holdout juror, Juror No. 11, and replaced him with an alternate. Pet. at 5. On remand, the California Court of Appeal affirmed the trial court's decision to remove Juror No. 11, finding that "juror No. 11 refused to deliberate by expressing a fixed conclusion at the beginning of deliberations, refusing to answer other jurors' questions or discuss his position, and maintaining a posture that created a physical barrier between him and the other jurors. The trial court's findings are fully supported by the juror interviews." Answer, Ex. I at 15.

A. Factual Background

The jury began its deliberations on April 21, 1998. RT 2716.  The next day, jurors sent a note to the judge stating they were at an impasse and that they needed further instructions. RT 2721.  Juror No. 9, the foreperson, clarified that the jury had received adequate instructions, but that they were having a hard time coming to any agreement.  RT 2723.  Juror No. 1 told the judge that "we have conflicting issues as far as what is reasonable doubt and what's not."  RT 2724.  The trial judge informed the jury she did not believe she could provide any further instructions, answers or information based on what jurors had told her. RT 2724.  The judge made some suggestions to help encourage deliberations and sent the jury back to attempt further deliberations.  RT 2724-2728.

During deliberations on the afternoon of April 23, 1998, jurors sent another note to the court stating they were unable to come to a unanimous vote.  RT 2730.  Jurors No. 1 and No. 2 told the bailiff they had a question for the court.  RT 2730-2731.  The bailiff also told the court that he had heard another juror mumble that that juror wished to talk to the judge.  RT 2731.  Over the objection of one defense attorney, the judge brought in one juror at a time to discuss what was occurring in the jury room.  RT 2731-2732.  Throughout questioning of jurors,

1  on this day and subsequent days as well, the court repeatedly instructed them not to report on the
2  substance of deliberations or provide a vote count.  See RT 2736, 2751, 2759, 2761, 2763, 2764,
3  2768, 2769, 2770, 2790, 2804, 2809, 2823, 2828-2829, 2837-2838, 2844, 2849.

4  The first juror interviewed was Juror No. 2, who indicated that Juror No. 11[4] was
5  not considering the evidence with an open mind and had, in fact, told several jurors that he was
6  not going to show up for any more deliberations.  RT 2734-2736.  Juror No. 2 said that Juror No.
7  11 had told the other jurors that he believed they were picking on him.  RT 2739.  Juror No. 2
8  also reported that Juror No. 11 would answer questions about his opinion on the case with "I
9  don't know," "I guess so" and "could be," and not with direct answers about his point of view.
10  RT 2739-2741.  Juror No. 2 reported that Juror No. 11 had told the jury at the beginning of
11  deliberations what his opinion of the case was and that his opinion was not going to change.
12  RT 2742.  Juror No. 2 then reported that he believed that Juror No. 11 was not willing to
13  deliberate with the rest of the jury, even if the court ordered him to do so.  RT 2742-2743.

14  The next juror interviewed was Juror No. 1, who indicated that the jury could not
15  deliberate properly because Juror No. 11 had told the jury that "he's not going to argue with us.
16  He doesn't feel that he has to explain anything to us."  RT 2748.  Juror No. 1 also reported that
17  Juror No. 11 had told him that he did not want to be there and that he was thinking about not
18  showing up any more.  RT 2749-2750.  When Juror No. 1 asked Juror No.11 if he was refusing
19  to deliberate, Juror No. 11 said that he was not going to argue.  RT 2750.  Juror No. 1 indicated
20  that he believed that Juror No. 11 was considering evidence that had not been admitted at trial.
21  RT 2752, 2755-2757.  Juror No. 1 also reported that Juror No. 11 had a "closed-off" posture and
22  did not look at the other jurors when he was speaking to them.  RT 2754.

23  The next juror interviewed was Juror No. 4, who indicated that Juror No. 11 had
24  told Juror No. 4 that "what's necessary to make a decision, is absolute 100 percent perfect factual

---

[4] Although the other jurors did not identify Juror No. 11 by number, it is clear from the context of their testimony and the record as a whole that they were referring to Juror No. 11.

1    information and reasonable doesn't come into play." RT 2760.  Juror No. 4 also indicated he
2    believed that Juror No. 11 had a bias against a witness that deviated from the legal standards that
3    had been provided to the jury.  RT 2761.
4            The next juror interviewed was Juror No. 9, who conveyed the feeling that Juror
5    No. 11 was not willing to participate in the deliberation process.  RT 2763-2765.  Juror No. 9
6    further told the judge that Juror No. 11 was not relying on admitted evidence, but was instead
7    relying on a lack of evidence that was not presented at trial and that Juror No. 11 had implied that
8    he was unwilling to follow the law regarding evidence.  RT 2764-2766.  Juror No. 9 indicated
9    that Juror No. 11 had discussed openly his views of the evidence and the other jurors' evaluation
10   of the case.  RT 2767.  Juror No. 9 also stated that Juror No. 11 had an impermissible bias against
11   one of the witnesses.  RT 2768.
12           The next juror interviewed was Juror No. 11, who indicated that he had reached a
13   conclusion, that the jury had argued for three days and that probably there was nothing that
14   would change his mind.  RT 2770.  Juror No. 11 said that he had been belittled and insulted and
15   that he was past the point of listening anymore.  RT 2771.  Juror No. 11 admitted he had said he
16   did not feel like coming back, but then said that he would return if directed to by the judge.
17   RT 2772-2773.  When asked by the judge if he would engage in deliberations with the other
18   jurors, Juror No. 11 responded that he would sit and listen, but that he thought that the jury had
19   discussed all the evidence.  RT 2773.  When the judge asked again if he would discuss the facts
20   and law and the evidence received in the trial with the other members of the jury, Juror No. 11
21   responded "I don't know" and said there was nothing new to consider.  Id.  Juror No. 11 stated
22   that he had an open mind about the evidence, had explained his viewpoint to the other jurors and
23   acknowledged other jurors had told him they did not believe he was following the judge's
24   instructions.  RT 2774-2775.
25           After the court's discussion with Juror No. 11, both defense attorneys moved for a
26   mistrial.  RT 2776-2782.  The trial judge refused to grant the motion for a mistrial at that point in

time. RT 2782. The next day, the prosecution filed a motion to dismiss Juror No. 11. RT 2784. The trial court heard from Juror No. 4 again about the accusation of Juror No. 11's bias against a witness and then found that the bias described did not sound legally impermissible. RT 2793-2794. Considering the various motions before the court, the trial judge decided to continue to question the jurors in order to have all relevant facts before the court. RT 2799, 2802.

The further interviewing began with Juror No. 3, who indicated that by and large the jury was trying to deliberate diligently. RT 2804-2805. Juror No. 3 also indicated, without singling out any one juror, that jurors on one side of the debate could not come up with reasons for their opinion and that their opinion seemed intractable. RT 2807.

The next juror interviewed was Juror No. 5, who indicated that a juror had indicated to the rest of the jurors that that juror had already made up his mind by the second day of deliberations. RT 2810. Juror No. 5 stated that he asked Juror No. 11 if he would deliberate with the rest of the jury and Juror No. 11 said no. RT 2810-2812. Juror No. 5 clarified that he had doubts about Juror No. 11's willingness to deliberate "from day one." RT 2812-2813. Juror No. 5 said that Juror No. 11 had disregarded most of the judge's instructions and was focusing on the attorneys themselves, rather than on the evidence. RT 2814. Juror No. 5 also said that Juror No. 11 had created a "physical barrier" by crossing his arms and legs. Id. Juror No. 11 also had refused to answer questions and just shrugged his shoulders a lot. Id. Juror No. 5 stated that he believed Juror No. 11 was not following the judge's instructions about the duty to deliberate. RT 2818.

The next juror interviewed was Juror No. 6, who indicated that on the first and second day of deliberations, Juror No. 11 made it clear that he already had formed his opinion about the case and that nothing was going to get him to change that opinion. RT 2824-2826. Juror No. 5 stated that Juror No. 11 was not following the legal standards the judge had given the jury. RT 2826.

/////

The next juror interviewed was Juror No. 7, who said that on the second day, Juror No. 11 had told the rest of the jury that his mind was made up and that nothing could change his opinion. RT 2829-2830. Juror No. 7 stated that when the other jurors would ask Juror No. 11 questions or to explain his opinion, he would shut down, say "I don't know" and indicate that he was not on trial. RT 2830. Juror No. 7 also reported that Juror No. 11 said he did not have to justify his opinions during deliberations. RT 2831. Juror No. 7 said that Juror No. 11 had never had an open mind about the case. RT 2835.

The next juror interviewed was Juror No. 8, who said that one of the jurors had already made up their mind on the first day. RT 2839-2840. On the morning of the first day of deliberations, Juror No. 11 stated that he didn't believe that the prosecution's case was credible or deserved any more consideration. RT 2840-2841. Juror No. 8 stated that Juror No. 11's mind was made up from the first day and that Juror No. 11 was unwilling to discuss his position with the rest of the jury. RT 2841. When the other jurors asked Juror No. 11 for his reasoning, they only got silence. RT 2842-2843.

The next juror interviewed was Juror No. 10, who said that Juror No. 11 had made his decision before deliberations ever began. RT 2845. Juror No. 10 said that the other jurors had to coerce answers out of Juror No. 11 and that it was like "pulling teeth." RT 2845-2846. Juror No. 10 also stated that Juror No. 11 was not following the court's instructions on evaluating evidence. RT 2846. Juror No. 10 described Juror No. 11's body language as "just sitting there very closed off, arms crossed, legs crossed . . . when someone was speaking, looking almost through them, not really at them or even away from them." RT 2848.

The final juror interviewed was Juror No. 12, who said that for the most part, the jurors had followed the court instructions, that there were varying opinions and that they were doing a good job in general. RT 2849-2850.

After considering all of the statements made by the jurors in their individual interviews, the trial judge granted the prosecution's motion to dismiss Juror No. 11. RT 2887.

The trial judge found that Juror No. 11 had failed to approach deliberations with an open mind, that he had failed to follow the instructions of the Court by referring to and relying on matters not in evidence, that he did not have an open mind regarding witness credibility and that he had "profoundly failed to engage in any meaningful deliberations with the other Jurors; and . . . has effectively refused to continue to deliberate with the other jurors." RT 2880-2881. The trial court relied on the statements of the other jurors and the testimony of Juror No. 11, especially his evasive answers and his closed-off body language that mirrored the body language described by many of the other jurors. RT 2881-2887.

On direct appeal, the California Court of Appeal found the trial judge's decision fully supported, and held that "Juror No. 11's refusal to participate in jury deliberations appears in the record as a demonstrable reality." Answer, Ex. I at 15.

B. <u>Analysis</u>

The last part of California Penal Code section 1089 provides for the discharge and substitution of jurors, as follows:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

In <u>Williams v. Florida</u>, 399 U.S. 78, 100 (1970), the U.S. Supreme Court held that the purpose of a jury trial was to prevent oppression by the government and given that purpose, the "essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." In <u>Miller v. Stagner</u>, 757 F.2d 988, 995, <u>as</u> <u>amended</u>, 768 F.2d 1090 (9th Cir. 1985), the Ninth Circuit held

/////

that Section 1089 preserved the "essential feature" of the jury as required by the Sixth and Fourteenth Amendments and was constitutional.

In this case, the court's focus is on whether the trial court's application of Section 1089 violated petitioner's constitutional rights, and specifically if substantial evidence supported the trial court's determination that there was good cause to discharge Juror No. 11. Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997).[5] The trial court's findings are entitled to "special deference" on habeas review. Id.

In its reasoned opinion, the the California Court of Appeal determined there was good cause to discharge Juror No. 11. Answer, Ex. I at 15. This conclusion will be disturbed only if it is an unreasonable application of Supreme Court precedent or is based on an unreasonable interpretation of the facts as presented in the state court proceeding. Neither of these hurdles is overcome here. The state appellate court's conclusion is not an unreasonable application of Supreme Court precedent. It also is well-supported by the factual record and is a reasonable interpretation of the facts as they were presented in the state court proceeding. Accord Perez, 119 F.3d at 1428 (affirming denial of habeas writ where state court's good cause determination was supported by the factual record).

The fact that Juror No. 11 was the lone holdout juror does not automatically invalidate the court's decision to excuse Juror No. 11 for good cause. A trial court's decision to remove a juror for good cause, even where the judge knew the juror was a lone holdout, will be upheld as long as the record shows the judge did not remove the juror in order to get a unanimous guilty verdict. Perez, 119 F.3d at 1427. In this case, the record shows that the trial court discharged Juror No. 11 based on Juror No. 11's unwillingness to perform the "essential function of a juror–deliberation," id., after careful consideration of permissible factors. See RT 2877-

---

[5] Petitioner argues that the applicable Ninth Circuit precedent is U.S. v. Symington, 195 F.3d 1080 (9th Cir. 1999). However, in Symington, 195 F.3d at 1086 n.3, the Ninth Circuit stated that Perez v. Marshall, 119 F.3d 1422 (9th Cir. 1997) was the appropriate precedent when a case is before the court on habeas review of a state court decision.

1  2888. In gathering information from jurors prior to her decision, the trial court also was careful
2  to avoid impermissibly intruding into the substance of deliberations.
3    Petitioner has failed to show that the state courts' adjudication of this claim either
4  was contrary to clearly established federal law, involved an unreasonable interpretation of clearly
5  established federal law or involved an unreasonable determination of fact.  His application,
6  therefore, should be denied.
7    IT IS HEREBY RECOMMENDED petitioner's application for a writ of habeas
8  corpus be denied.
9    These findings and recommendations will be submitted to the United States
10 District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within
11 twenty days after being served with these findings and recommendations, any party may filed
12 written objections with the court and serve a copy of all parties. Such a documents should be
13 captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the
14 objections shall be served and filed within five days after service of the objections. The parties
15 are advised the failure to file objections within the specified time may waive the right to appeal
16 the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
17 DATED:  January 25, 2006.

              UNITED STATES MAGISTRATE JUDGE

fulg1714.157